May it please the Court, Your Honors. Anne McClintock, Assistant Federal Defender on behalf of Mr. N. Charles Pickett. Mr. Pickett presents this Court with what I hope is a rare factual and legal situation. He represented himself at trial. He did so while chained to a restraint chair. He did so while in prison in jail clothing. The justification for his shackling initially was his, what he calls his neurotic episode. I think that's a fair characterization of the record. That on the morning of trial he had a stress attack, was not prepared. And if you look at excerpts of record, I believe it is, I just lost it. Excerpts of record 42, the judge says that because of Mr. Pickett's attitude and because he's unable to give the relief that Mr. Pickett wanted, which was appointment of counsel at that point, that he was concerned about Mr. Pickett's willingness to follow directions, so he shackled him. They called a recess till the afternoon when the jurors were available to come in and begin in voir dire. At that point, Mr. Pickett apologized for his behavior, explained the nature of his stress reaction, why he was unprepared. And even in the morning during the discussion about shackling him, he explained that he objected to the chains. And I'll quote him. At 1300, the reporter's transcript, this is excerpts of record 40, I'm not a slave, that's why I'm in these chains. I can't comply with you, meaning I can't, I'm not willing to accept this situation. He's complaining about a lack of advisement of counsel. Is that in the current trial or is that in the previous trial? Well, there were three trials. This is in the second? This is right at the beginning of the second trial. In the third trial, does the record demonstrate any objection to the shackling, to the restraints? I found no affirmative comment in the third trial until he's filed his motion for a new trial. Okay. And the second question I have about the third trial is whether there's any suggestion that the jury was able to see the chair restraints in the third trial. I think your brief says it's an open question, and I guess I — I think it is somewhat an open question. I think he's taken — at various points during the third trial in the motion for — in his papers, he writes that the jury didn't see him because he stayed seated. But in the argument on the motion for a new trial, I think he has some statements in there where he says that it was obvious to the jurors between his prison garb and the way he was seated that he was — I don't know that he used the word chained or shackled, but when I read it, it sounded like he was saying that it was obvious to him that the jury's reaction to him, that they knew he was chained. I don't think the record's terribly clear. As far as — I will concede that when he filed his petition in both state and federal court, he said that the juror — that he didn't know that — I think the way he phrased it was the jury didn't see him chained. If there's no affirmative indication in the record that the jury could tell and there's no indication of a contemporaneous objection with regard to the restraints, how can we possibly grant relief? There are two prongs to my reaction. One is that he, Mr. Pickett, made the contemporaneous objection at the second trial and that there's no reason why that did not continue through. Well, how's the third judge supposed to know about that? The third judge claimed to have reviewed the record. She actually claimed that she had talked to Judge Peterson, I believe it was, and that his behavior had been — that he comported himself well during the second trial, that he had gotten up and walked around, and so she felt that what was going on was appropriate. Now, the district attorney did correct her when she was misinformed or misperceived what Judge Peterson told her about Mr. Pickett walking around. But is it not possible to give up a claim once made if it's not renewed? I think under the circumstances of this case, that Mr. Pickett is repeatedly asking for advisory counsel, and as he explains during the motion for new trial, and I think it's more clearly explained in the reporter's transcripts portion of it, that part of the problem that he is having is his access to the law library is very restricted. He's not getting the two hours that they anticipated a week. He's getting at most — I think he's complaining 45 minutes. And he has made repeated requests for advisory counsel for a variety of issues. And at the end, he's saying part of his problem is without advisory counsel, he doesn't know how — what to raise again, what not — or what the circumstances are of why he can be chained or when he can't be chained. The other aspect — I'm trying to remember my thought — to Judge Graber's question was that in the context of the advisory counsel requests, it is very clear that Judge Sweet, the third trial judge, did not want to revisit any issues of that nature that the previous judges had ruled on. And she explicitly said, as to advisory counsel, that I'm not going to revisit that because it was already dealt with. I'm not going to act as a court of appeals. She said that's not her job. Her job has the same ranking as the other trial judges, so she wasn't going to revisit it. And that's repeated often enough that I think Mr. Pickett had a reasonable understanding that there was no point to repeating it. He complained about it initially, and he was stuck. I think if you also look at the tenor of the discussion between Mr. Pickett and if you go back to the Ferretti hearing, his explanation of why he wanted to be pro per is a lot of it has to do with his perception of his ability to communicate to the jurors his innocence and the problems that existed with the complaints about his behavior. Counsel, I have a similar question with respect to the clothing. Again, does the record of the third trial show any specific objection to the clothing? And the second question is, even though the judges were aware that Levi's and a green shirt were prison garb, is there any suggestion that this was something that would be obvious to jurors, as distinct from, say, the orange jumpsuit that they wear in Oregon, which you'd never see anyone on the street in? I think that the position that the State has taken on appeals that we haven't made are showing that they were identifiable to the jurors as prison garb. If you take a look at the motion for new trial and discussion about that portion of it, the DA, I think, concedes in his reaction to it that this was identifiable as jail garb. By whom, though? By the jurors. When Mr. Pickett is saying, I'm sitting here and they know that I'm in custody, they know that I'm this less-than-human person, that he's humiliated by it, it's affected his ability to concentrate, to communicate, when he's explaining all of those emotional reactions on him and how he's being perceived by the jury, the DA never once says that it wasn't something that a layperson would perceive as being jail garb. He talks about it in terms of being jail clothing. If you also look at the earlier discussion regarding, I think it was right before the third trial, there was another request for an advisory council, and there was a discussion about Mr. Pickett's investigator and problems he was having with the investigator getting subpoenas of witnesses interviewed, and particularly regarding the expert witness, the serologist. He mentions that, I'm jumping around a little bit, I apologize. He mentions that during the initial complaint about being shackled, that that's one of the problems that he's why he needs a council, because this expert isn't ready for trial. He can't get this expert to complete the test that he needs done. But during the motion for a new trial, he talks about, I'm sorry, I'm at the beginning of the third trial. He talks about the investigators not doing his work. And at the end, and the judge says, I'm going to inquire as to that. So it sounds from the record that she contacted the investigator. He wasn't available that morning, during that morning session, and that there would be further follow-up with the investigator as to exactly what he's doing, whether he's satisfying Mr. Pickett's Sixth Amendment rights to investigate. They go along with his self-representation. If you look at the motion for a new trial, it is there that Mr. Pickett explained that his investigator not only did he not do the work as far as the two witnesses he wanted, that the investigator refused to go out to the property storage area and get his clothes. So once again, there is enough evidence in the record that Mr. Pickett has asked. When the issue was raised by the second judge, he asked for civilian attire. It wasn't granted him. It wasn't gotten to him. And I think the fair reading of the district attorney and the judge's comments at the third trial reflect that it is something that everyone would recognize as jail clothing. If there's any dispute about it, I think this is one aspect of the case that rather than being affirmed would need to go back to district court for factual development. I mean, one of the alternative remedies that we asked for on the shackling was that we go back to take a look at what the jurors' reactions were. I think the focus of his view of the prejudice... How do you go about doing that? I just finished an evidentiary hearing last December on exactly the same issue. You go back and you investigate and you take a look at, contact the jurors. Do they recall it? A jury remembering somebody shackled, even though it's been a number of years, tends to be a vivid thing if they actually did recognize that the person was shackled. That sticks out. My experience has been that sticks out. Who poses the leading questions on that? We don't lead in habeas, Your Honor. We ask straightforward questions. And my experience has been it's the district attorney's investigator that asks the leading questions. If there's some aspect of that factual development that needs to be exhausted, you know, we have to go through the proper procedures. But I don't think on the state of the record that it's something you can deny him and maintain his life sentence for, given the interrelationship between these issues. And in any case, I think the record as it exists is sufficient to grant him relief, just focusing on the interplay between Freda and shackling and what Mr. Pickett has said it did to him and his ability to communicate. If you look at the Freda hearing again, I repeat myself a bit, it's very clear to me that the main reason that Mr. Pickett wanted to represent himself was because his perception of his ability to communicate with the jury was superior to that of Ms. Kent, his public defender, that he viewed this trial largely in racial terms because he was an African-American male, the victim was white, the other complaining witness as far as the prior bad acts was white, and everybody else in the courtroom were white. I don't know about the jurors. But that it was important for him to be able to stand as a man and explain his situation. Putting him in chains prevented him from being able to stand up. I think he even said that at one point when they asked him if he wanted to make an opening statement. He said he didn't have the will. I mean, his soul was so damaged at that point that he'd rather just hide behind the chair and communicate. So he has explained, I think, very clearly that the combination of events, but particularly the shackling and the clothing, discombobulated his psyche such that he was unable to communicate. I don't think there are any other points. If there are no other questions, that's mostly what I'm interested in answering is any questions you have. I'll reserve the remainder of our time. Thank you. Thank you. Thank you. May it please the Court, Deputy Attorney General Julia Bancroft, appearing on behalf of Respondent Apelli Duncan. The analysis in this case must begin and end with the Supreme Court precedent under the AEDPA, and I'm going to go through and address each of the three factors that we've talked about here because the Court has inquired as to each, dealing with the clothing, the shackling, and the lack of the right to advisory counsel. And under 2254D, we have to ask ourselves whether the opinions below were contrary to clearly established law in order for this Court to grant relief. First, some overriding comments as to all arguments. Our position still remains that the second trial, that that really is irrelevant to the current conviction like the district court held. That doesn't mean we're supposed to ignore it. In fact, it does offer some guidance. And so I addressed both the second trial and the third trial in my briefing. I do object to the contention that the continuous objection on pages 2013 and 16 must fail. This is something where they allege that the petitioner's comment that he was having this continuous objection should therefore apply to the clothing and shackles, and that just is not the case. If the Court looks specifically at page 2012-2012, and this is at the third trial on October 22nd, right before the trial began, the Court asked the petitioner whether he has any information that he wants to go through forward on the suppression motion, the 1538.5 motion. So she's asking him specifically about that incident. And he responds, quote, that he's not skillful enough to make these motions. He just has to object and assert an ongoing objection. He's not skilled enough to litigate, quote, this particular motion. So that comment that he made was simply addressing the 1538.5 motion and was never meant to be an objection to his clothing or shackling. Indeed, if you look after the third trial at the motion for a new trial on January 2nd, the Court says that he could have objected to the clothing and his shackles, and the defendant admitted that he didn't even know that he could. And that's specifically on pages 26, 53, and 54. So it's contrary to the position that the public defender is now taking that it was a continuous objection when the defendant or petitioner himself admitted that he didn't even know that he could. The Court reminded him at that point that that was part of the dangers. If he didn't know that he could, does that carry with it the corollary that the earlier objection is one that he expected to carry over? That the petitioner expected to carry over? Yes. If he didn't know that he could renew it, does that carry with it the implication that for a lay person, his understanding was that the earlier objection was enough to preserve it? Well, two things about that. First, it's our position that he never objected in the first place, so it wouldn't be a carryover objection in this regard. And second, he was specifically warned of those dangers of self-representation and that he may not know how to make the proper objections. It's unfortunate, but that's the choice that he himself decided to make. And as I get into the portion on advisory counsel, I'll bring out that multiple times the petitioner was specifically instructed that he could ask for lead counsel at any time. And while he requested advisory counsel on a number of times, while he did so, he did that on the first day of trial when it was too late for that to happen and he didn't make the requisite showing. So that would be my response to that. Going to him never objecting to the clothing and shackling, it's our position that he didn't object in the first instance. And we're talking at the second trial, and this is when the judge himself brought up the discussion of clothing. The judge initiated the conversation and asked him what he meant or what he preferred to do regarding the clothing, and he indicated that it was his, quote, preference to be in civilian clothing. It's our position that a preference is not an objection. Furthermore, the judge at that second trial made every effort to comply with that preference. He asked the bailiff to look into it. It seems like there were other clothes that might be available. And then after that, there was no further discussion. The DA recalled at the very end of the third trial, at the motion for the new trial, that it was the defendant's or petitioner's preference that he be in, that he remain in his clothes, and that's at 2648. And also, petitioner mentioned that he didn't have clean clothes, which may have been another reason for his decision not to discuss that. But in any event, there was not an objection at that second trial. There was not any mention of it whatsoever until the third trial. In fact, it was at the end of the third trial at the motion for the new hearing when the judge expressed some surprise that the defendant even was mentioning at that time. Counsel, do you agree or disagree with opposing counsel's assertion that it was obvious to the jury as well as to the judge that the Levi's and green shirt constituted jail garb? We would strongly disagree. And under the U.S. Supreme Court precedent, we need to look at whether he was compelled to be in jail clothing and whether it was identifiable. I've just made the case that he was not compelled because he did not bring an objection. And now our claim is that it was not identifiable. We've got a description of a green shirt and jeans. There's not any indication that there were markings on the clothing whatsoever. A petitioner has at no time made any such claim. In fact, in responding in the reply brief, in responding to the cases that mentioned how it's the petitioner's burden to show that the clothing was identifiable, they just mentioned that those cases were interesting. And they don't go on to offer any support that the clothing was identifiable as such. So to answer this Court's earlier question, if the clothing is not obvious and he failed to object, it would be our position under this clothing issue that he was not compelled and it was not identifiable. Furthermore, it's not a violation of U.S. Supreme Court precedent in any event. Any other questions regarding the clothing? One further point that I'd like to make on that is in the reply brief, the Public Defender's Office makes a big point out of the fact from the Fifth District Court of Appeal talking about the make-known language. And again, that's a different circuit. And I quoted in my briefing mainly to point out that an objection needs to be made in both of those cases if this Court is to look at the Stahl and the Beto case, which I didn't correctly cite. The correct citation is 443F.2D643. In both of those cases, the courts found that the clothing was identifiable. So those are distinguishable. As far as the shackling issue is concerned, there is very little if not no actual overriding Supreme Court precedent on shackling. Most of the authority that we get comes from this circuit. There are two cases that I cite to, Illinois v. Allen and Estelle v. Williams, and neither of those cases directly deal with shackling. Shackling was just dicta mentioned in both of those cases. They talked about binding and gagging and different methods to deal with different people who are offending the courtroom and being disruptive in Illinois v. Allen and then in Estelle about the clothing. But in any event, there's no Supreme Court case directly addressing shackling, so we cannot say that there is any violation of clearly established law regarding this issue under the Supreme Court precedent. We do have some Ninth Circuit precedent that is more detailed in effort to get the petitioner or defendant a fair trial. In any event, none of the circumstances of this case are violated by the Ninth Circuit precedent. So what I'm saying here is we're safe under either method. Under the Supreme Court precedent, we're not violating that by his shackling and the same thing under the Ninth Circuit. In Stewart v. Corbin, the court talked about how it's important for us to look and give the trial court discretion and grant them deference, that shackling is appropriate in situations where the person is disrupted, and they talk about different situations where that is appropriate. And to talk about some of the specific facts, again, here, like with the clothing, the petitioner did not object. He did not object at the beginning of the second trial when the shackles were first put on him, and he did not object in the third trial when he was brought to court in shackles also. When he says on page RT-1304 that he's thinking of slaves, that's not an objection. His quote that the public defender's office mentioned today, Ms. McClintock, I'm a man, not a slave, that's not an objection to shackling. There are no sites that they use in the reply brief to talk about where there is an objection, and that's because there are none. If this court looks at the record from 1299 to 1306, they'll see that there was no objection. And, again, like I mentioned earlier, petitioner's comment that he didn't know that he could object undercuts the petitioner counsel's argument that he did object in that case. Petitioner also mentioned how they're not required to object before each trial, but what they're trying to do is shift the burden to the people here. And under Jones, this court has said that for a new trial, a court is not required to conduct a hearing before shackling occurs. In fact, it is the defendant's or petitioner's burden to object. While not necessary, I did mention in my briefing that the judge did use the least restrictive means available. There was a hidden waist chain. The arms or legs weren't shackled. And, importantly, on page RT-2647, Judge Sweet mentions at the motion for a new trial that at both trials, petitioner was given an opportunity to stand and move around and address the jurors. He chose not to do that, however, and he mentions later the reasons that he did not do that was because of fear on 2652, his being unprepared, RT-1300, and his lacking confidence and feeling like he would faint, 2642. So, significantly, we see that he did not object at the first trial or the second trial. I would also suggest that the actions at the second trial justified his shackling, unlike Ms. McClintock indicated. He said that he was going to, quote, act like a Negro. He told the guards they were going to have to fight him. The court indicated in response that it was aware of Allen and what to do with a disruptive defendant, even warned petitioner that he may have to take him out of the room if he continued to act this way. And petitioner replied, if that's what you have to do, that's what you have to do. That was only a short-term episode, was it not? That was a short-term episode, Your Honor. It's our position, however, that once the shackles were justifiably placed on petitioner, it was his burden to object to them, which then would have required the court to conduct a further hearing on it. Do you understand Judge Sweet's suggestion that he could have, if he had opted to, move around, stand up to address the jury? Was that uttered in the context of the shackles continuing to be applied? And if so, how is that going to work? I don't understand what you mean by how is that going to work. Well, how is it then, you know, the suggestion is that because he was seated, there was a strong unlikelihood and there's no evidence that the jurors observed the shackling because the shackling was around his waist and it was not clearly visible. But if the judge was extending the opportunity to be walking around, standing, addressing the jury, would that same thing have applied? I don't understand your point on that. I think my point is that the judge indicated that she was going to allow petitioner, if he so chose, to stand and address. Unshackled or shackled? It's my understanding from reading the record that it would have been unshackled because she indicated that he would be able to move around and address the jury. And she also, in that same conversation, talked about how the jury didn't see the shackles and how they were hidden and that sort of thing. I can't say affirmatively what I think would have happened, but from my reading of the record, that's what I believe. Saying that's what the judge's comments suggested. That's my interpretation, yes. And if you look, the court also inquired as to whether they were seen. And on page 2647, the defendant specifically acknowledges that the jury did not see him coming in and out of the courtroom in shackles. Nowhere in the record, and I've looked at it very, very carefully, did he indicate that the jury saw him. However, the court itself mentioned on at least two occasions, and I'm talking about 2649 through 50 and then 2659, she talks about how the jury did not see the shackles at that time and there was no evidence that they saw those shackles. And Petitioner made no comments whatsoever that they did. So it's our position that they were not visible. I think your opposing counsel's theory is that the jury would have understood that he was shackled from the fact the way he was sitting at the table, that that would have been a logical inference from the fact that he never rose. Well, there's no indication in the record that. I would go at this point. I would go back to the fact that under the U.S. Supreme Court precedent, there is no specific law on shackling. And we can't say, you know, whether the jury inferred that he was shackled because he remained seated the entire time. That's not really the question. The question is whether it was an unreasonable application of the Supreme Court precedent, and it's our position that it was not. I can't say that they didn't presume that he was shackled because he remained seated the whole time. Regardless of whether they made that presumption, there's no evidence. Petitioner offered no evidence that that occurred, and therefore I don't think that we can assume that that happened just because he remained seated. Under the further cases, the defendant or petitioner has the burden to show that he was substantially affected or injured by this. He's not indicated in any way that he was specifically injured by the fact that the jury may have seen him shackled. Indeed, the court itself mentioned that there's no difference between the second and the third trial. He was in the same clothing, and he was shackled in both the second and third trial, yet he receives a mistrial on the third count in the second trial and actually gets the verdict on the third. So to say that these were the cause, you can't make that sort of argument because he needs to show that he received some sort of burden. To distinguish the remand cases that Petitioner mentioned, Rodin and Parrish, neither one of those cases are applicable here because they determined, the courts in those cases determined the decision to shackle was erroneous. There wasn't justification to shackle. And in both of those cases, Petitioner's counsel objected to the shackling. That's not present here, so we don't need to remand in that instance. Also, it's Parrish that mentions 2254E2 and how when the defendant fails to develop a record that the jurors did know these things and fails to make that factual record, then the reviewing courts have no authority to grant an evidentiary hearing in that regard. And that's in footnote 3 of Parrish. Any further questions about shackling? I'd like to conclude with a brief discussion about advisory counsel. Again, Petitioner was specifically warned of the dangers of self-representation, both by the judge on RT 907 to 924 and also in the papers that he signed at CT 86 to 88. He was warned of the time he was facing, and he was specifically warned that he cannot ask for advisory counsel or an attorney right before the trial is to begin, and that's on 912 and 913. So when he requested advisory counsel at the June 7th hearing before the second trial, he was actually given advisory counsel for the limited purpose of the 1538.5 motion, even though the court later denied his other request for advisory counsel for research, and as we indicated in our briefing, there is no constitutional right for advisory counsel. Also, as I noted on June 25th, in between that or right before the second trial, the judge did order the library to give the petitioner more access to research materials. What about the third trial? In the third trial, at the beginning of the third trial, Petitioner asked for advisory counsel on the day of trial or the second day of pretrial motions, and the judge indicated that that request would be denied because of the belated motion and the fact that he did not establish justification or reasoning for advisory counsel. So we've got those requests. And one other additional thing is in my briefing, I indicated that there were no requests made from the second trial to the third trial, but there is one note from the prosecutor that states, and this is on RT-2015, where the prosecutor states that Petitioner did ask for advisory counsel in between the second and third trials. So that's different from what I established in my briefing, so I want to point that out to this court. But at the same time, he did not bring justification, and the court did not find he was justified in asking for advisory counsel. They granted him more time to research in the library, and they also informed him that if he wanted an attorney, he could get an attorney at that time. Are you suggesting that at that point he had about as much experience as some of the defense counsel that I've observed, or is that not the State's point? Perhaps, Your Honor. That may definitely be the case. One final comment in my last 20 seconds is in respect to the cumulative error argument that they make in the R.B. under Chambers, the Supreme Court has never said that we can add up error to find cumulative error, and, in fact, in Chambers they were careful to limit it to that case and not create new law. So unless the court has any further questions, the people will submit. Thank you, Judge. With your permission, I want to borrow a book. 2254b-1. You should stand over here. Speaks in terms of objectively unreasonable. Actually, it's been interpreted to speak in terms of an objective unreasonableness. There is a second prong that permits this court, the federal courts, to grant habeas relief. My book is trained to turn to 2254. I'm not finding it. I believe it's D-2. It talks in terms of factual, the underpinnings being factually unsupported by the record. It doesn't speak in terms of, I'm not finding it. I'm going to skip that. There are two prongs to granting habeas relief. What I think I would urge you to do is take a careful reading of the timeline of Mr. Pickett's case and the factual reasons that the trial judges gave at the various points for denying him, one, for shackling him to begin with, and then for denying him advisory counsel. And you will see that the reasons they gave are not supported. The initial reason for bringing Mr. Pickett into court, chained up, manacled, ankle chained together, may have been justified. I'm not going to say that it was or it wasn't. But the jury was not present. He was not advocating for himself at that point in front of a jury, so I can't say that there was a prejudicial effect from that. But the two reasons the judge gave for doing it was because of Mr. Pickett's declarations in the solding cell that he was going to act out and that the judge could not accommodate what Mr. Pickett wanted, which was counsel. That was June 26th. He then that afternoon says, I apologize, I was having his neurotic episode. It actually smells to me, although I'm not raising this issue, but it's akin to having someone having a mental breakdown on the eve of trial, and there's some question of competency, whether it's not something that I think lingers, but if you look at the court's decision in Miles v. Stainer from 1997, which I happen to know quite well, there are certain sui sponte obligations that trial judges have. And we have up for tomorrow. Yes, and you're not going to let me come back and talk to you tomorrow. But I point to that because there are certain obligations the trial judge has, regardless of who's in front of him, regardless of who's advocating on behalf of the defendant, that they need to make sure that fundamental fairness is being honored in the court. And I submit that if you look at the timeline and the reasons that were given in each of these phases, fundamental fairness didn't exist anywhere for Mr. Pickett in this case. There are a couple of points that, and I don't think the facts, if you carefully look at the facts, I don't think they support it. So I don't think, I think habeas really could have been granted under the factual prong of D2, beginning of my subsections. The dangers of self-representation is a point that the Attorney Generals have harped on quite a bit. When the Feretta hearing took place, he was, had counsel with him. He had been in trial in street clothes. He had not been shackled. There was no discussion of shackling. There was no discussion of clothing or any of those kind of specific warnings. The Feretta warning, we don't complain that Feretta was violated as far as the advisements, but they are general advisements. And then also during the Feretta hearing, the judge specifically said, if you act out in some manner that you're going to interfere with the proceedings, I can revoke your waiver of counsel and impose counsel on you, even if you don't want it. It seems to be what Mr. Pickett was doing on the morning of June 26th. They've made quite a point of saying that Mr. Pickett's request for advisory counsel came too late. It was on the first day of trial. It may have been at one point on the first day of trial, or even two points. I think it might have been made both, at the beginning of both the second and third trials. But it was repeated. The second trial resulted in a hung jury on the third count. It goes to the third trial. He asked for advisory counsel on the first pretrial hearing day. I have it that he actually asked for in writing on October 21st. I'd urge you to look at the clerk's transcripts, 364 to 370. It's denied on the 22nd because the judge says, we're ready for trial. What does the judge do? She's then sick for two days, and the case is continued. He had the court had three days right there where nothing, you know, he's been denied his right to have advisory counsel, and then nothing happens for two days. I mean, someone could have called the panel administrator and said, get somebody over here. We've got three days to work with now. The attorney general insists that there's no binding Supreme Court precedent regarding shackling. I think that if you look at Allen v. Illinois and Holbrook, that there is extremely on point and binding Supreme Court precedent that shackling a defendant in a trial is a matter that one does as a last resort. Of course, Illinois v. Allen or Allen v. Illinois was a kind of extreme restraint placed on a defendant. It was also, excuse me. Right? It was an extreme restraint, but it was also an extreme case of acting out. Yeah. Mr. Allen repeatedly hurled F-attacks at people, calling people names. I believe he spit at people. I believe he threw things. I don't know whether he actually tried to assault or stab anyone. But he was acting out in an extreme manner. Mr. Pickett on the other extreme is having a stress attack in the holding cell and then recovers his composure. He's even asked during the third trial not to play the race card. So he doesn't talk in terms that he did during the second trial, because he is trying to confine his behavior to the norms of the courtroom. What's called shackling in this case, I gather, was a chain around the waist. Is that right? That's on the court record. I did offer photographs. We have them and can make them available of what this chair looks like. It's basically a 1960s swiveled chair. It's the same chair that's used by all the other parties, but the back opening that is visible for the other chairs has a fabric flap, and it has a metal clip or a metal piece that's welded in where they can take the belly chain and bring it around the back and then either handcuff it or actually padlock it in, and then the fabric folds over. It's been my experience that that's visible, not the chain so much as it jutting out. So, I mean, there are other things that go to, I think it was Judge Reinhardt's question, about the jury perceiving the shackling without seeing a link of a piece of metal. But the shackling is not as extreme. I mean, we don't say he was gagged. He certainly was not. He was a very vocal advocate in the manner that he could vocalize himself, you know, express himself. But at the same time, I think he makes it very clear that his ability to communicate was effectively shackled because between the clothing and his shackling to the chair, that his ability to communicate was hampered as well. So when the state says that he's not challenged, that he hasn't proved that it's affected him, they've never challenged factually either in the superior court or anywhere else that his assertions about the effect it had on his communication, his ability to articulate his defense, isn't true. With that, I will leave it unless there are any questions. Thank you. Thank you both very much. The case just argued will be submitted.
judges: Reinhardt, Graber, Shadur